JERRY G. GREENWAY AND BETTY R. GREENWAY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Greenway v. Commissioner
Docket No. 17986-82.
United States Tax Court
T.C. Memo 1987-4; 1987 Tax Ct. Memo LEXIS 4; 52 T.C.M. (CCH) 1283; T.C.M. (RIA) 87004; January 5, 1987. *4 Respondent determined numerous specific adjustments to petitioners' income for the years 1970 through 1976. Additionally, respondent determined unreported income based on the source and application of funds method of income reconstruction. Held: the statute of limitations bars the assessment and collection of deficiencies in income tax and additions to tax for the years 1970 and 1973. Held further, respondent's specific adjustments for the years 1971, 1972, and 1974 through 1976 are sustained; held further, respondent's source and application of funds determinations are sustained for the years 1972 and 1974 as modified herein; held further, Mrs. Greenway is subject to a self-employment tax for the years 1971 and 1972; held further, Greenway is liable for the civil fraud addition pursuant to sec. 6653(b) for the year 1972; held further, Mrs. Greenway is not liable for the civil fraud addition pursuant to sec. 6653(b) for any of the years at issue. Stanley F. Birch, Jr. for the petitioners. Steven Erie, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined deficiencies in, and additions to, petitioners' Federal income tax for the years and in the amounts indicated: Additions to Tax
Section 6653(b) [1]
Liability of
Liability of
Year
Deficiency
Jerry G. Greenway
Betty R. Greenway
1970
$5,278.22
$2,639.11
$0 1971
488.53
1,101.97
1,101.97
1972
73,660.57
44,445.88
44,445.88
1973
12,866.90
6,433.45
0
1974
62,150.08
31,075.04
0
1975
3,127.95
0
0
1976
975.67
0
0
The issues presented for consideration are: (1) Whether the statute of limitations bars the assessment and collection of deficiencies in income *7 tax and additions to tax for any of the years 1970 through 1976; (2) whether petitioners received unreported taxable income during each of the years 1970 through 1976 and, if so, in what amounts; (3) whether petitioners are entitled to deductions and credits as computed by respondent; (4) whether petitioner Betty R. Greenway is subject to a self-employment tax for the years 1971 and 1972; (5) whether petitioner Jerry G. Greenway is liable for the civil fraud addition pursuant to section 6653(b) for each of the years 1970 through 1974; and (6) whether Betty R. Greenway is liable for the civil fraud addition pursuant to section 6653(b) for each of the years 1971 and 1972. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners Jerry G. Greenway (Greenway) and Betty R. Greenway (Mrs. Greenway), husband and wife, resided in Maysville, Georgia, at the time they filed their petition herein. Petitioners filed a joint Federal income tax return for each of the years 1970 through 1976. Each return was prepared in part by either George Cashin, Jack *8 Donald, or their staff. [2] Petitioners have three children, each of whom resided with petitioners and was claimed as a dependent on petitioners' Federal income tax return. Greenway is a high school graduate, but Mrs. Greenway is not. In September 1956, Greenway commenced employment with Home Finance Corporation as a loan adjuster and, later, as a supervisory manager. During 1958, Greenway resigned from Home Finance Corporation and commenced employment with Phelan Finance Corporation, where his duties included the following: making and closing loans, processing loan documents, monitoring currency of accounts, verifying cash receipts and disbursements, and supervising location managers in their operation of branch offices. Greenway left the employ of Phelan Finance Corporation in 1964. Greenway and Winston Massengale (Massengale) formed a partnership called Jerwin, Inc. (Jerwin) in 1966. Greenway and Massengale each held a 50-percent interest in the partnership. [3] On August 28, 1969, Greenway and Massengale formed a corporation entitled University Motor Company, Inc. (UMC) *9 in which each owned 50 percent of the corporate stock. The business of Jerwin and UMC was the sale of used automobiles. In early 1970, Greenway and Massengale dissolved their joint business dealing. Massengale took Jerwin's corporate name and stock while Greenway took UMC's corporate name and stock. UMC remained a used car dealership after Greenway became its sole shareholder. UMC operated a sales lot in Atlanta, Georgia, from 1970 through 1974 and another lot in Griffen, Georgia, during 1970 and 1971. In February 1974, UMC's entire operation was moved to Gainesville, Georgia, although the Atlanta location did not actually cease business until August 1974. During the years 1970 through 1976, Greenway was president and sole shareholder, and Mrs. Greenway was secretary-treasurer, of UMC. UMC filed a United States Corporation income tax return for the *10 fiscal years ended July 31, 1970 through July 31, 1975. These returns were prepared in part by either George Cashin, Jack Donald, or their staff. UMC Operations
In addition to his responsibilities as president of UMC, Greenway maintained the corporation's daily sales and receipt records. At any given time, Greenway had one or two employees working for him at UMC. The employees would perform office duties and clean, repair, and sell cars. Jimmy Raines (Raines) was employed as an office manager at UMC from December 1970 to July 1971. Raines' duties included receiving payments from customers, recording the payments on daily collection and sales sheets, collecting on accounts, and running customer credit applications. Each Saturday, Raines turned over to Greenway all the cash and sales records of UMC for that week. Greenway thereafter provided sales and receipt records to UMC's bookkeepers on a monthly basis. William Murray (Murray) was a salesman for UMC at the time Raines was the office manager. Murray worked on a commission basis. When he made a sale, a check would be made out to him in the appropriate amount. At Murray's request, Greenway would occasionally make *11 checks out to a fictitious body shop, repair shop, or garage and the check would then be endorsed by Murray. In the event that sufficient funds were on hand, the check would be cashed for Murray by Raines at UMC's cashier window. Murray frequently asked Greenway for advances on Monday against pay to be received by him on Friday or Saturday. Gregory S. Bailey (Bailey) worked as a salesman at UMC on two or three different occasions during the period 1969 through 1971. Bailey also worked on a commission basis, making approximately $150 in a good week. In 1969, Bailey endorsed "several checks" that were made out to fictitious payees. From some of these checks he received a portion of thr proceeds and from some he did not. Bailey was told that the funds retained by Greenway or his bookkeeper were used to pay UMC's out-of-pocket expenses. [4] The checks were written by Greenway and cashed by Raines. Bailey did not want his commission checks made out in his name because he did not want to pay taxes on the income, nor did he want his previous wife to trace him through the records. Bailey knew of no other UMC employees who endorsed checks in a similar fashion. *12 Loan from Charlie Greenway
On December 24, 1969, Greenway executed a deed to secure debt in favor of his father, Charlie Greenway. The conveyance was made to secure a note in the amount of $25,000 executed on the same date. The note was payable on demand, with an interest rate of 7 percent per annum. The real estate conveyed was Greenway's house in Stone Mountain, Georgia. The deed was subject to a first mortgage in favor of DeKalb County Federal Savings and Loan Association for an unspecified amount. The deed was filed on August 6, 1970, with the DeKalb County Superior Court and was entered as satisfied on September 19, 1977. No explanation was provided for the approximately 8-month delay between execution of the deed and its recordation. Petitioners had received loans from Charlie Greenway on several occasions prior to the loan at issue, but the filing of a deed reflecting the loan to them was exceptional. The deed was executed to ensure that Charlie Greenway would be reimbursed for the loan in the event of Greenway's death. Greenway invested the $25,000 in UMC. Charlie Greenway did not testify at the trial due to his incompetence and senility. At the time the *13 loan was made, Charlie Greenway had a bank account with Commerce First National Bank. There was no showing as to whether Charlie Greenway's account at the Commerce First National Bank was debited for $25,000 in 1969. Mobil Home Rentals
In July 1970, Greenway approached Jane Braswell (Braswell) regarding the rental of a mobile home. Braswell and her husband owned and operated Country Park Estates, a mobile home trailer park located in Athens, Georgia. Greenway requested that Braswell rent a trailer for him. Braswell agreed to place the trailer in Country Park Estates, select the tenants, and collect the monthly rents thereon. Greenway had no personal involvement in the day-to-day activities associated with renting the trailer. Pursuant to their agreement, Braswell collected the monthly rental checks, and sent those checks to Greenway at UMC. Braswell would make needed repairs to the trailers, and would subtract the costs of these repairs from the monthly rental payments remitted to Greenway. Greenway would then endorse and cash the checks submitted to him. Braswell understood the rental trailer to be owned by Greenway. During the calendar years 1970 through 1974 Braswell *14 mailed the following net rental proceeds to Greenway: Year
Amount
1970
$532.05
1971
1,010.60
1972
966.35
1973
988.57
1974
306.03
Petitioners did not report any of these amounts on their Federal income tax returns for the calendar years 1970 through 1974. Petitioners' relationship with Braswell ended in May 1974. Stolen Property
On January 29, 1971, Greenway pleaded guilty in Fulton Superior Court to the felony of theft by receiving stolen property. Greenway's conviction involved the sale of 45 dinette tables, 212 dinette chairs, and 2 quilted furniture pads having a total value of $1,320. Greenway purchased the dinette sets at a discount from a shipping manager at the Gate City Table Company. The dinette sets were sold through a furniture store owned by Greenway, and were paid for with checks drafted upon the store's account. On April 15, 1971, the Fulton Superior Court sentenced Greenway to 3 years' probation and fined him $300. Income from the sale of the dinette sets was reported on the furniture company's corporate income tax return. Additionally, Greenway sold Arrow shirts, Polaroid film, and cigarettes on the UMC lot. The shirts, *15 film, and cigarettes were delivered to the lot by truck. The various items were then sold by UMC employees with the sale proceeds being remitted to either Greenway or Raines. [5]
Personal Expenses Paid by UMC
During the calendar year 1972, UMC paid $665 in attorney fees related to petitioners' purchase of real property. Additionally, during the calendar years 1973 and 1974, UMC paid petitioners' personal expenses in the amount of $952.79 and $721.56 respectively. Interest Income
Petitioners maintained numerous passbook accounts and certificates of deposit in the names of their children during the years at issue. All interest income earned on the accounts was reported by the children on their returns, and the taxes owed thereon were paid by petitioners. No gift tax returns were filed by petitioners reflecting the transfer of funds to their children, and petitioners retained complete control over the funds at all times.Deposits were transferred indiscriminately by petitioners among the children's accounts in *16 an attempt to maximize the interest earned. Petitioners closed out the only passbook account in their name in August 1970, thereafter making cash deposits to, and withdrawals from, the children's accounts. [6]
Sarah E. Foster (Foster) was manager of the Decatur Federal Savings and Loan (DFSL) branch where petitioners banked during the years 1970 through 1974. Foster was personally responsible for, and involved in, preparing the summary of accounts used by respondent. Petitioners maintained four separate passbook accounts and 26 separate certificates of deposit in either their own or their children's names during the years at issue. Foster supervised the compilation of records indicating all deposits and withdrawals affecting either petitioners' passbook accounts or certificates of deposit. Foster initially checked computer-generated quarterly printouts maintained by DFSL, which indicated the date particular activity occurred. The actual documents involved in the transaction were then pulled, cross-checked against the quarterly printouts, and recorded *17 in the summary provided to respondent. It was this summary, and not the quarterly printouts or the original documents, that was used by respondent. The original passbooks were returned to petitioners when the accounts were closed. The certificates of deposit, quarterly printouts, and transaction documents were routinely destroyed by DFSL after the summaries were prepared. Certificate of Deposit
Petitioners purchased a certificate of deposit from the First National Bank of Atlanta (FNBA) on November 12, 1974, in the amount of $137,039.10 due to mature on December 31, 1974. Petitioners' bank statement for the period ending November 27, 1974, indicates a debit to petitioners' account in the amount of $137,039.10. Petitioners' balance in the account was $7.65 as of December 27, 1974. The bank statement for the period ending January 29, 1975, indicates a deposit to petitioners' account of $138,729.25 on January 9, 1975, with the withdrawal of an identical amount on January 14, 1975. The ledger card for the account does not indicate the purchase of any additional certificates of deposit, and no explanation was offered as to how the funds withdrawn on January 14, 1975, were *18 used. Thomas M. Barnett (Barnett) was a staff auditor with FNBA from 1969 through 1976. From the records available to him, Barnett concluded that the funds resulting from maturity of petitioners' certificate of deposit on December 31, 1974, were placed in an escrow account to await instructions from petitioners. These funds, through not technically in petitioners' account, were nonetheless available to petitioners upon maturity of their certificate of deposit on December 31, 1974. A review of petitioners' bank statements and ledger cards indicates that petitioners' accounts were not always credited with funds from a matured certificate of deposit on the date of maturity. Bank Accounts
Petitioners had a net increase in the aggregate bank accounts held in their names and in the names of their children for the years and in the amounts indicated: Year
Amount
1970
$1,583.40
1971
4,350.02
1972
150,976.67
1973
11,738.19
1974
23,290.31
Disposable Income
Petitioners stipulted to having disposable income for the years and in the amounts indicated: Year
Amount
1970
$4,287.29
1971
8,862.81
1972
8,268.00
1973
8,066.00
1974
8,319.46
*19 For the tax years 1971 through 1974, petitioners received Federal income tax refunds in the following amounts: [7]
Year
Amount
1971
$1,795.10
1972
1,009.02
1973
1,020.49
1974
912.16
Miscellaneous Income
During the calendar year 1971 and 1972, Mrs. Greenway received $2,387.46 and $694.47, respectively, in gross income from the operation of a beauty parlor. During the calendar year 1974, petitioners received rental payments from UMC of $650 per month for a period of 9 months totaling $5,850. Real Estate Transactions
On August 19, 1971, petitioners remitted $7,318.55 to DeKalb Federal Savings and Loan in satisfaction of the mortgage on their residence at 4199 Central Drive, Stone Mountain, Georgia. On March 13, 1972, petitioners purchased a parcel of real estate at 5057 Memorial Drive, Stone Mountain, Georgia, (Memorial Drive Property) for $92,000.00. On May 31, 1973, petitioners purchased a tract of real estate for $8,500 from Dorothy Abernathy. On March 18, 1974, and on March 20, 1974, petitioners purchased separate parcels *20 of real estate from July L. Saunders and W. R. Robinson (Robinson) in the amounts of $10,000 and $18,200, respectively. Loans to UMC
Petitioners made the following loans to UMC for the years and in the amounts indicated: Year
Amount
1970
$13,387.97
1972
17,730.00
1973
14,091.68
1974
58,991.05
Living Expenses
Mrs. Greenway contemporaneously maintained records relative to the Greenway's household expenses. These records did not include expenses for food, housing, transportation, income taxes, or entertainment. According to Mrs. Greenway's records, petitioners incurred household expenses for the years and in the amounts indicated: Year
Amount
1973
$5,285.86
1974
4,727.25
1975
7,364.17
1976
7,052.62
According to a summary prepared by the U.S. Department of Labor, the annual cost of an intermediate budget for a family of four living in the Atlanta area for the calendar years 1970 through 1974 was as follows: Year
Amount
1970
$9,523
1971
9,813
1972
10,430
1973
11,684
1974
13,098
The Department of Labor's statistics included the following items: food, housing, transportation, clothing, personal *21 care, medical care, social security, disability insurance, personal income taxes, and other family expenses. The Department of Labor's statistics more accurately reflect the aggregate expenses a family would expect to incur. Memorial Drive Property
On July 2, 1971, Greenway applied to DFSL for a mortgage to purchase the Memorial Drive Property. [8] The purchase price for the Memorial Drive Property was $92,000. DFSL issued a 30-day loan commitment for $69,000 on October 21, 1971. The loan had a proposed interest rate of 8-1/2 percent for a term of 20 years. On December 30, 1971, Greenway paid a 1-percent deposit in the amount of $690 to have the loan commitment extended to January 30, 1972. The loan commitment was extended, but Greenway did not exercise it as of the expiration date. On February 1, 1972, DFSL notified Greenway that the loan offer had expired. On March 9, 1972, Greenway deposited $91,378.16 in cash with DFSL. Greenway then purchased a cashier's check in the same amount which he used to purchase the Memorial Drive Property. On June 15, 1972, petitioners *22 sold the Memorial Drive Property for $146,584.57. Petitioners did not report the gain from this transaction on their 1972 Federal income tax return. [9]
Fraud Conviction
On September 13, 1977, Greenway pleaded guilty to filing a false income tax return for 1970 in violation of section 7206(1) and to filing a false and fraudulent income tax return for 1972 in violation of section 7201. By Order of this Court dated September 14, 1984, Greenway was collaterally estopped from denying that his 1970 income tax return was false and that his 1972 income tax return was fraudulent. Greenway was not estopped, however, from contesting the amount of the underpayment in either year. OPINION Statute of Limitations
The first issue for decision is whether the statute of limitations has run for the years 1970 through 1973. Petitioners have stipulated that the years 1974 through 1976 remain open. Additionally, petitioners have stipulated that the year 1971 remains open if respondent can prove a 25-percent omission pursuant to section 6501(e)(1). The year 1972 is open based upon Greenway's *23 conviction pursuant to section 7201. Strachan v. Commissioner,48 T.C. 335 (1967); Gemma v. Commissioner,46 T.C. 821 (1966); Arctic Ice Cream Co. v. Commissioner,43 T.C. 68 (1964). For the years 1970 and 1973, petitioners contend that respondent must demonstrate by clear and convincing evidence that their return was fraudulent pursuant to section 6501(c)(1). Determination of the existence of fraud for purposes of the limitation period, and for purposes of the fraud addition, are governed by almost identical principles. Therefore, a single determination of fraud, on a year-by-year basis, disposes of both issues. The issue of fraud poses a factual question which is to be decided upon an examination of all the evidence in the record. Mensik v. Commissioner,328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962); Stone v. Commissioner,56 T.C. 213, 224 (1971). Fraud is an actual intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to *24 be owing. E.g., Webb v. Commissioner,394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Powell v. Granquist,252 F.2d 56, 60 (9th Cir. 1958); Wiseley v. Commissioner,185 F.2d 263, 266 (6th Cir. 1950), revg. 13 T.C. 253 (1949). Fraud is not to be imputed or presumed. Beaver v. Commissioner,55 T.C. 85, 96 (1970). Fraud may be proven by circumstantial evidence, however, because direct proof of the taxpayer's intent is rarely available. Powell v. Granquist,supra at 61; Gajewski v. Commissioner,67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Beaver v. Commissioner,supra at 92-93. Respondent contends that petitioners' consistent and substantial understatement of income as demonstrated by both his specific adjustments and the source and application of funds method indicates petitioners' fraudulent intent to conceal and misstate taxable income. We recognize that a consistent pattern of underreporting large amounts of income is strong evidence of fraud. *25 Holland v. United States,348 U.S. 121, 139 (1954); Webb v. Commissioner,394 F.2d 366, 378-379 (5th Cir. 1968). The mere omission of income, however, is not enough to satisfy respondent's burden of proof. Otsuki v. Commissioner,53 T.C. 96, 106 (1969). Petitioners' unreported taxable income resulted primarily from interest income, constructive dividends, and the source and application of funds adjustments. The interest income was earned on passbook accounts and certificates of deposit maintained by petitioners in the names of their children. It is clear from the record that petitioners controlled the accounts held in their children's names, and that the funds in the accounts were used by petitioners as their own. Respondent has failed to demonstrate, however, that petitioners opened the custodial accounts with the intent to avoid the payment of tax, rather than as fiduciaries for their children. Intent can be inferred from circumstantial evidence, Powell v. Granquist,supra;Gajewski v. Commissioner,supra, *26 but the facts before us do not negative a legitimate attempt on petitioners' part to create accounts for their children's education, enjoyment, or general welfare. The transfer of funds was admittedly incomplete and did not constitute a gift. All income earned on the accounts was reported on the children's returns, however, and no attempt was made by petitioners to conceal the existence of the fiduciary accounts. Petitioners attempted to minimize the family's aggregate tax liability by assigning interest income to their children. We conclude that petitioners' attempted transfer of funds and assignment of income was incomplete and unsuccessful, but not fraudulent. Respondent points next to constructive dividends received by petitioners from UMC as evidence of consistent and substantial understatements. These constructive dividends were in the form of personal expenses paid by UMC and Greenway's use of used cars held by him for sale. Greenway admitted to driving any car on the lot "that's not cleaned up." We recognize that this constitutes a taxable benefit but respondent has offered no evidence indicating a fraudulent intent on Greenway's part. No testimony was offered indicating *27 whether Greenway knew that the use of corporate vehicles was taxable, or detailing actions by Greenway that would indicate an effort on his part to conceal his use of such vehicles. We do not view use of the vehicles alone as indicative of a fraudulent intent. For the years 1970 through 1974, UMC paid insurance premiums for Greenway. The record does not indicate what kind of insurance was purchased, how it was paid, or what records were used to reconstruct the expenditures. Similarly, UMC paid Greenways' legal fees and real estate fees for the years 1972 and 1974, respectively, but no evidence is provided as to what the particular expenses were associated with. Respondent also includes within UMC's constructive dividends to Greenway the amount of $2,050 for a motorcycle in 1974. Petitioners have offered no evidence to rebut respondent's assertions of constructive dividends, but we do not find the naked assertions alone indicative of a fraudulent intent. Only payment of the insurance premiums constituted a pattern of conduct, and we do not know what the nature of that insurance was. Finally, respondent points to petitioners' unreported income as computed pursuant to the source *28 and application of funds method as indicative of Greenway's fraudulent intent. It is true that Greenway's conviction for fraud pursuant to section 7201 is conclusive as to the year 1972. As discussed below, we sustain respondent's determinations under the source and application of funds method for the years 1972 and 1974. Additionally, we recognize that petitioners' understatements for the years 1972 and 1974 were substantial. Nonetheless, it has not been shown by clear and convincing evidence that the understatements for the years 1970, 1971, 1973, and 1974 were due to fraud. Respondent's assertion that substantial sums of money were skimmed from UMC is unconvincing. Murray and Bailey were singularly unimpressive witnesses. They admitted that they requested their paychecks to be made out in the name of fictitious payees to avoid making alimony payments. After carefully reviewing the entire record, we conclude that respondent has failed to meet his burden of proof in demonstrating fraud for any of the years other than 1972. Consequently, the statute of limitations has run for petitioners' taxable years 1970 and 1973. For the year 1971, *29 respondent must demonstrate a "substantial omission of items" to extend the 3-year period of limitations to 6 years by operation of section 6501(e)(1)(A). A substantial omission is defined as an omission from gross income of "an amount properly includable therein which is in excess of 25 percent of the amount of gross income stated in the return." Sec. 6501(e)(1)(A). The burden is on respondent to establish by a preponderance of the evidence that the 6-year statute of limitations is applicable. Armes v. Commissioner,448 F.2d 972, 974 (5th Cir. 1971), affg. in part and revg. and remainding in part a Memorandum Opinion of this Court; Williamson v. Commissioner,27 T.C. 647, 659 (1957). Respondent has met this burden. Petitioners reported a gross income of $10,600 for 1971. Respondent determined, and petitioners do not dispute, that Mrs. Greenway omitted $2,387.46 in beauty shop income for 1971. Additionally, as discussed below, petitioners failed to include on their return $3,570.03 of interest income earned on passbook accounts and certificates of deposit owned by petitioners but held in their *30 children's names. Reporting of that income on their children's returns, and petitioners payment of taxes owed on it, does not satisfy the section 6501(e)(1)(A)(ii) requirement that the omission be "disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary of the nature and amount of such item." The omission of $5,957.49 in combined beauty shop income and interest income satisfies the section 6501(e)(1)(A) requirements. Consequently, we hold that the statute of limitations for 1971 has not run. Specific Adjustments
In the notice of deficiency, respondent determined specific adjustments to petitioners' income as detailed in Appendix A. Petitioner bears the burden of proof as to these adjustments. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). Consequently, we will discuss only those adjustments specifically contested by petitioners, and sustain respondent as to the rest. Respondent contends that petitioners earned unreported interest income on passbook accounts and certificates of deposit held by DFSL for the years and in the amounts indicated: Year
Amount
1971
$3,570.03
1972
8,673.16
1974
17.45
*31 Petitioners contend that the underlying documents relied upon by respondent are incomplete and inaccurate, though petitioner concedes that respondent's summary of those documents is correct. We found Foster's testimony regarding the compilation of petitioners' DFSL records credible and convincing. The quarterly printouts were checked against the actual documents involved in the transaction, and a thorough search was made for all passbook accounts and certificates of deposit held by petitioners or their children. We find that petitioners have not demonstrated that the summary of accounts is either inaccurate or incomplete. [10]
Petitioners next contend that all interest income *32 earned on bank accounts maintained by petitioners in the names of their children was fully reported on tax returns filed on behalf of their children and that taxes were paid thereon. Three of the DFSL passbook accounts and 26 of the certificates of deposit were ostensibly held by petitioners as custodians for their children. Petitioners failed to file gift tax returns for any of these purported transfers. Substantial sums of money were deposited to, and withdrawn from, the various accounts over the years at issue. Petitioners treated the funds as their own, and moved them freely among the various accounts. There was no intention on petitioners' part to absolutely and irrevocably divest themselves of title to, or control over, the transferred funds. Since petitioners provided funds for the accounts, and retained complete dominion and control over both principal and interest, we conclude that no valid gifts were made to the children. Crane v. Commissioner,49 T.C. 85, 90 (1967). Thus, as an initial matter, we find that the funds held in the children's names belonged to petitioners. [11]
*33 Significant amounts of interest income were reported on the children's income tax returns for the years 1972 through 1974. The tax on this income was paid by petitioners. The interest income was properly includable in petitioners' gross income, however, and the improper inclusion of the interest on the children's returns does not change this result. Consequently, we sustain respondent's determination that interest income on the DFSL accounts was properly included in petitioners' income. [12]
For the years 1973 through 1976, respondent determined additional unreported interest income received by petitioners from accounts with FNBA, the First National Bank of Gainesville (FNBG), and additional unidentified sources. These accounts were in either Greenway's name or in Greenway's name as custodian for one of his children. Petitioners do not dispute the amount or ownership of interest income determined to have been earned on these accounts. Therefore, we sustain respondent's entire interest income adjustment. Petitioners offer *34 no evidence contradicting any of the other specific item adjustments determined by respondent. Thus, petitioners fail to meet their burden of proof as to these issues, and we sustain the remainder of respondent's specific item adjustments as detailed in Appendix A. Source and Application of Funds
The next issue for decision is whether respondent properly determined that petitioners had additional unreported income as computed pursuant to the source and application of funds method of income reconstruction. This method is based upon the assumption that the amount by which a taxpayer's application of funds during a taxable period exceeds his reported sources of funds for that same period has, absent some explanation by the taxpayers, taxable origins. See Burgo v. Commissioner,69 T.C. 729, 742 (1978); Troncelliti v. Commissioner,T.C. Memo. 1971-72. It is open to petitioner to point out areas or specific instances in which the method used by respondent failed to reflect true income. As an explanation, the taxpayer may show that the difference between *35 the total application of funds and the total reported sources of funds is attributable to such nontaxable items as loans, gifts, inheritances, or assets on hand at the beginning of the taxable period. In the absence of adequate books and records, respondent is justified in determining petitioners' tax liabilities by the source and application of funds method. Holland v. United States,348 U.S. 121 (1954). This method of income reconstruction has long been accepted by this Court. Vassallo v. Commissioner,23 T.C. 656 (1955); Cohen v. Commissioner,9 T.C. 1156 (1947), affd. 176 F.2d 394 (10th Cir. 1949). Respondent's determination is presumptively correct, and petitioners have the burden of overcoming this presumption. Rule 142(a). Petitioners do not dispute that respondent is entitled to reconstruct income by use of the source and application of funds method. Where, as here, petitioners' books and records do not reflect all of their sources of income, and use of the method shows a significant discrepancy between reported income and income computed under that method, respondent is justified in relying on an *36 indirect method of establishing true taxable income. See Lipsitz v. Commissioner,21 T.C. 917, 931 (1954), affd. 220 F.2d 871 (4th Cir. 1955), cert. denied 350 U.S. 845 (1955). Application of Funds
In the Notice of Deficiency, respondent determined that petitioners made an application of funds during the calendar years 1970 through 1974 as detailed in Appendix B. For the years 1970 through 1974, respondent reconstructed the deposits, withdrawals, and balances of petitioners' accounts with DFSL, FNBA, and FNBG. Petitioners assert that respondent failed to ascertain petitioners' total deposits and bank accounts with DFSL. Thus, petitioners maintain that respondent's summary of these accounts is incomplete and inaccurate. We disagree. As discussed previously under respondent's specific adjustment to petitioners' interest income, we found Foster's testimony concerning the reconstruction of petitioners' DFSL accounts thoroughly convincing. Every precaution was taken to ensure that each of petitioner's accounts was identified and carefully reconstructed. Petitioners have offered no evidence to suggest the existence of unaccounted *37 for accounts. Therefore, we find that respondent's determination of an increase in petitioners' DFSL bank accounts is correct. For the year 1974, petitioners contend that respondent included $138,729.25 in an FNBA account that was not actually in the account as of December 31, 1974. Petitioners note that the FNBA bank statement for the period ending December 27, 1974, indicates a balance in the account of $7.65. Respondent points to the bank ledger card maintained by FNBA which indicates that petitioners purchased a certificate of deposit on November 12, 1974, due to mature on December 31, 1974, in the amount of $137,039.10. We agree with respondent that the proceeds from the certificate of deposit which matured on December 31, 1974, should be included in petitioners' bank account even though they were not technically credited to his account until January 9, 1975. Respondent did not include the value of that certificate of deposit anywhere else in petitioners' application of funds. Thus, there is no double accounting of that amount. Petitioner has offered no explanation as to how these funds were otherwise applied, and does not deny purchasing the certificate of deposit. *38 We find that respondent's computation of the increase in petitioners' FNBA accounts for 1974 is also correct. Living Expenses
Respondent determined petitioners' personal living expenses for the years 1970 through 1974 to be as follows: Year
Amount
1970
$9,494.45
1971
11,158.29
1972
7,358.11
1973
8,942.62
1974
8,883.56
In substantiation of his determination, respondent submitted petitioners' personal bank records from the Citizens Bank of Georgia, the Citizens and Southern Bank of Stone Mountain, and Peachtree Bank and Trust Company. Respondent has failed to demonstrate how the bank records relate to his determination of petitioners' living expenses. Consequently, we have been unable to draw any useful conclusions from them. Respondent next submits U.S. Department of Labor statistics for the annual costs of a four-person family on three budget levels for the years 1970 through 1976 as compiled by the Bureau of Labor Statistics. These publications contain tables giving the average annual living expenses of a hypothetical family of four, under certain described circumstances, living in designated metropolitan areas throughout the country. The statistics *39 include expenses for food, housing, furnishings, transportation, personal care, medical care, clothing, social security, and taxes. Respondent uses as a comparison figures from the Atlanta area for a family with an intermediate budget. The statistics are based on a family of four, while petitioners had a family of five. Respondent's determination of petitioners' living expenses was less than the statistical average despite the difference in family size for all years other than 1971. Petitioners contend that their life-style was a frugal one, and this claim was substantiated by the testimony of Jack Donald, their accountant. Petitioners submitted records of household expenses incurred during the period of January 1973 through July 1979. Typical items included in the records were as follows: doctors' bills, drugs, gas, electricity, telephone, insurance, water, cablevision, and papers. These records appeared authentic, and are indicative of petitioners' life-style, though they do not represent a comprehensive list of expenses incurred in maintaining a family of five. Notable omissions include food, [13] housing, transportation, Federal taxes, and general household expenses. *40 We conclude that petitioners' life-style was a modest one, but that respondent's determination of petitioners' living expenses reflects that. Petitioners have failed to demonstrate that their over-all living expenses were less than those determined by respondent. Respondent can use various indirect methods of proof to reconstruct taxpayer's income. One such method, used by respondent in this case, is to rely on or make reference to Department of Labor Statistics. See Giddio v. Commissioner,54 T.C. 1530 (1970). Reference to such statistics is based upon the reasonable assumption that petitioners had taxable income which includes the normal cost of supporting a family. [14] We conclude that respondent's figures reflect petitioners' modest life-style, and that petitioners have failed to meet their burden of demonstrating otherwise. Therefore, respondent's determination of petitioners' living expenses is sustained. *41 Petitioners do not dispute respondent's determination of investments in UMC for the years 1970 through 1974. Respondent has documented these investments as recorded on journal entries, bank statements, and UMC's Federal tax return. Similarly, respondent's determination of petitioners' payments on real estate and of UMC's payment of petitioners' personal expenses is uncontested. For the year 1974, respondent contends that petitioners paid $9,750 for a building owned by Clarence Ransom (Ransom) which was located on property owned by Robinson. Petitioners' purchase of the building was part of a transaction in which petitioners were acquiring Ransom's inventory of used cars and equipment. Petitioners paid $20,000 for the cars and equipment, which respondent treated as an investment in UMC. Petitioners subsequently purchased Ransom's building and Robinson's land from Robinson for $65,000. A down payment of $18,200 was made on this purchase in 1974, and is uncontested by petitioners. Robinson subsequently paid Ramsom for the building from the proceeds received from petitioners. On the advice of his attorney, Greenway refused to purchase a building from Ransom when Robinson would *42 not lease him the property it was built on. Consequently, we adjust respondent's determination of petitioners' application of funds for 1974 by reducing the "purchase of building" adjustment in the amount of $9,750. In all other respects, we sustain respondent's determination of petitioners' application of funds. Source of Funds
In the notice of deficiency, respondent determined that petitioners had sources of funds during the calendar years 1970 through 1974 as detailed in Appendix C. Petitioners have not disputed the sources of funds identified by respondent. The burden of proof as to this issue is on petitioners. Rule 142(a). Consequently, we find that the sources of funds determined by respondent are correct. Unreported Taxable Income
Respondent contends that the excess of petitioners' total application of funds over petitioners' total source of funds constitutes understated taxable income as detailed in Appendix D. Respondent maintains that petitioners' source of unreported taxable funds was earnings skimmed from UMC, income from mobile home rentals, and the sale of stolen property. Petitioners contend that they had a cash hoard of $25,000 in 1969 representing *43 the proceeds from a loan made to them by Charlie Greenway, and that they received an additional loan of $92,000 from an undisclosed source in 1972. We agree with respondent that petitioners received and failed to report taxable income from the rental of mobile home units. Petitioners argument that the trailers were owned by Sam Murray, an acquaintance living in Alaska, was wholly unsubstantiated. We also find that Greenway's sale of cigarettes, shirts, and film at the UMC lot generated taxable and unreported income. Neither of these sources of income, however, would account for the substantial deficiencies determined by respondent. Recognizing this, respondent asserts that the majority of petitioners' unreported income resulted from the diversion of corporate receipts from UMC. Petitioners contend that they received $25,000 from a loan made to them by Charlie Greenway on December 24, 1969. The deed to secure debt was executed on December 24, 1969, and filed on August 6, 1970. It appears in all respects to be genuine. Pursuant to the "leads doctrine" established in Holland v. United States,348 U.S. 121, 135-136 (1954), it is incumbent upon respondent to *44 track down leads reasonably susceptible of being checked. Respondent asserts that Charlie Greenway did not have $25,000 at any one time to lend petitioners, pursuant to Charlie Greenway's prior testimony in the criminal proceedings. [15] Respondent failed to determine whether Charlie Greenway's bank account indicated a debit of $25,000 in 1969 or if he had any other source of such funds in 1969. Consequently, for purposes of respondent's source and application of funds computations, we must assume and so find that petitioners had an additional $25,000 on hand as of December 24, 1969. We held that the statute of limitations had run for the year 1970, however, and no unreported taxable income resulted from the source and application of funds method for the year 1971. Consequently, based on Greenway's testimony that he invested the $25,000 in UMC, we hold that the funds were not available as a cash hoard in 1972 and do not reduce respondent's source and application of funds determination for that or any subsequent year. As an additional source of nontaxable income, petitioners contend that *45 they received an interest-free cash loan in the amount of $92,000 to purchase the Memorial Drive property. Petitioners were unwilling to identify the individual who loaned them the money out of a supposed concern for potential liability to the lender's heirs. Greenway made a cash deposit and an immediate withdrawal in the form of a cashier's check on March 9, 1972, in the amount of $91,378.16. At no point during either the criminal or civil investigation did Greenway reveal the identity of the person who loaned him this money. Petitioners applied to DFSL for a loan to purchase the Memorial Drive property on October 21, 1971, and paid $690 to have the loan offer extended through January 30, 1972. Petitioners argue that the loan application supports their contention that the funds were borrowed, though not from DFSL. We disagree. Petitioners refused to identify an individual who purportedly loaned them a significant sum of money. Petitioners uncorroborated and self-interested testimony does not satisfy his burden of proof on this issue. Respondent made numerous inquiries regarding the source of the supposed loan, but Greenway consistently refused to reveal the lender's identity. *46 Thus, respondent fulfilled his obligation to pursue this lead to the extent possible. In the absence of any evidence substantiating petitioners' assertion of a cash loan, we hold for respondent in finding the cash to be a taxable source of income. Consequently, we sustain respondent's source and application of funds determinations for the years 1972 and 1974 as modified above. Self-employment Tax
Petitioners do not dispute Mrs. Greenway's liability for a self-employment tax for the years 1971 and 1972. Respondent's determination is therefore sustained. Fraud
As discussed above, in order to sustain his determination as to the fraud addition to tax, respondent must prove, by clear and convincing evidence, thast some part of an underpayment for that year is due to fraud. Sec. 7454(a); Rule 142(b); e.g., Stone v. Commissioner,56 T.C. 213, 220 (1971); Otsuki v. Commissioner,53 T.C. 96, 102 (1969). Viewing the record as a whole, we conclude that respondent has not sustained his burden of showing fraud on the part of Greenway for any year *47 other than 1972. Additionally, we conclude that Mrs. Greenway is not liable for the addition to tax pursuant to section 6653(b) for either 1971 or 1972. Mrs. Greenway's failure to report her beauty shop income and UMC salary was unexplained, but respondent failed to demonstrate a clear and convincing intent on her part to fraudulently omit income. Decision will be entered under Rule 155
APPENDIX A Specific Item
1970
1971
1972
1973
Interest Income
$3,194.49 $3,570.03 $ 8,673.16 $10,036.16 Beauty Shop
Income
2,387.46 694.47 Salary - Betty
Greenway
397.47 Constructive Divi-
dends from Univer-
sity Motors
1,395.00 2,983.83 4,183.41 3,191.32 Depreciation
Land Clearing
Medical expense
522.53 141.36 (141.83)
379.89 General Sales Tax
(186.00)
(67.00)
(203.28)
(322.32)
Self-employment Tax
Investment credit
General tax credit
Total Specific
Items
$4,926.02 $9,413.15 $13,205.93 $13,285.05 (Ex. 15-0, page 5)
Specific Item
1974
1975
1976
Interest Income
$19,012.16 $12,231.23 $3,949.37 Beauty Shop
Income
Salary - Betty
Greenway
Constructive Divi-
dends from Univer-
sity Motors
5,323.70 Depreciation
(446.82)
(487.50)
(487.50)
Land Clearing
3,000.00 1,400.00 Medical expense
422.32 145.85 General Sales Tax
(131.86)
(34.00)
Self-employment Tax
Investment credit
General tax credit
Total Specific
Items
$23,889.04 $15,054.19 $4,973.72 (Ex. 15-0, page 5)
*48 APPENDIX B Application
1970
1971
1972
1973
1974
Increase in
bank accounts
$ 1,583.40
$ 4,350.02 $150,976.67
$11,738.19
$ 23,290.31
Payments on real
estate
7,318.55 Personal living
expenses
9,494.45
11,158.29 7,358.11
8,942.62
8,883.56
Investment
in University
Motors
13,387.97
(12,520.61)
17,730.00
14,091.68
58,991.05
Payments on real
estate purchased
92,043.16
8,500.00
28,200.00
Personal expenses
paid by University
Motor Company
952.79
721.56
Purchase of
Building
9,750.00
Total Application
of Funds
$24,465.82
$10,306.25 $268,107.94
$44,225.28
$129,836.48
(Ans. p. 4; Ex. 15-0)
APPENDIX C Source
1970
1971
1972
1973
1974
Salaries
$4,287.29 $ 8,862.82 $ 8,268.00
$ 8,066.00
$ 8,319.46
Tax refunds
or (payments)
(139.03)
1,795.10 1,009.02
1,020.49
912.16
Interest Income
3,243.93 3,570.03 8,685.91
10,036.49
19,614.37
Business Profit
from Beauty
Shop
2,387.46 694.47
Carry over excess
(6,309.15)
Sale of assets
146,584.57
Paid by corporation
on Memorial Drive
665.00
Excess Available
6,309.15
Collection on
Gainesville
5,850.00
Property
Total Source
of Funds
$7,392.19 $10,306.25 $172,216.12
$19,122.98
$34,695.99
(Ans., p. 4; Ex. 15-0)
*49 APPENDIX D Item
1970
1971
1972
1973
1974
Total Application
of Funds
$24,465.82
$10,306.25
$268,107.94
$44,225.28
$129,836.48
Less: Total Source
of Funds
7,392.19
10,306.25
172,216.12
19,122.98
34,695.99
Understated Taxable
Income
$17,073.63
$ 95,891.82
$25,102.30
$ 95,140.49
(Ans., p. 4; Ex. 15-0;
Entire record)
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. George Cashin and Jack Donald were certified public accountants practicing in Decatur, Georgia.↩
3. Petitioners have stipulated to the formation of Jerwin as a partnership, but also to the distribution of Jerwin's corporate name and stock. This discrepancy is unresolved in the record, but does not effect our decision in this case. We assume that Jerwin was incorporated subsequent to its formation as a partnership.↩
4. No evidence was offered indicating the amount of corporate funds involved in these check-cashing arrangements. While it is clear that corporate checks were made out to factitious payees, it is not clear that Greenway diverted these funds to his own account. Raines was unaware of any kickbacks received by Greenway as a result of the checks cashed by him.↩
5. No additional shirts, cigarettes, or film were delivered to, or sold from, the UMC lot subsequent to Greenway's arrest for sale of stolen dinette sets.↩
6. Petitioners maintained a checking account with the Citizens Bank of Georgia for at least the years 1971 through 1974.↩
7. Refunds were presumably received in the calendar year following the tax year for which the refund was due.↩
8. Greenway's $25,000 obligation to his father was not listed on his loan application as a liability.↩
9. Petitioners subsequently filed an amended return for 1972 reporting this gain.↩
10. Petitioners pointed out a typographic error in the summary provided by Foster indicating that a transaction had occurred on June 25, 1960, rather than the correct date of June 25, 1970. We recognize that such errors can occur in any summary of original documents. It is unfortunate that petitioner did not have access to the original records used to compile the bank's summary, but we are convinced that great care was taken by Foster in compiling the summary, and that it is substantially correct.↩
11. The following exchange took place at trial between the Court and petitioner's attorney: THE COURT: Do I correctly assume that you are contending that the funds that were in the custodianship accounts that we've discussed today were fiduciary funds and not attributable to the Petitioners? MR. BIRCH: No, sir. Frankly, we admit that the Petitioner used those funds very liberally himself. THE COURT: For his own purposes? MR. BIRCH: For his own purposes. That's clear from the record.↩
12. When this determination becomes final, petitioners or their children may have a claim under section 1311, et seq. for a return of the taxes paid.↩
13. Milk and eggs are listed on several occasions.↩
14. Department of Labor Statistics were specifically relied upon in the following cases. Denson v. Commissioner,T.C. Memo. 1982-360; Wheeling v. Commissioner,T.C. Memo. 1982-246, affd. without published opinion 709 F.2d 1512 (6th Cir. 1983); Kindred v. Commissioner,T.C. Memo. 1979-457, affd. 669 F.2d 400↩ (6th Cir. 1982).
15. Charlie Greenway did not testify in this case because of his acknowledged senility.↩